**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES II LLC,<br><br>Plaintiff,<br><br>v.<br><br>AT&T MOBILITY LLC, AT&T MOBILITY II LLC and NEW CINGULAR WIRELESS SERVICES, INC.,<br><br>Defendants.<br><br>and<br><br>ERICSSON INC. and TELEFONAKTIEBOLAGET LM ERICSSON,<br><br>Intervenors. | ) | C.A. No. 14-1229 (LPS)<br><br>**JURY TRIAL DEMANDED** |

**<u>ANSWER AND DEFENSES TO COMPLAINT</u>**

Defendants AT&T Mobility LLC; AT&T Mobility II LLC; and New Cingular Wireless Services, Inc. (collectively, "AT&T" or "Defendants"), by and through their attorneys, answer the Complaint ("Complaint") filed by Plaintiff Intellectual Ventures II LLC ("Intellectual Ventures II") and assert defenses as follows:

**ANSWER**

**<u>Parties</u>**[1]

1. AT&T admits that Intellectual Ventures II is a Delaware limited liability company. AT&T is without knowledge or information sufficient to form a belief as to the truth

[1] Headings are reproduced from the Complaint for convenience only and are not an admission.

of whether Intellectual Ventures II has its principal place of business located in Bellevue, Washington and, therefore, AT&T denies this allegation. AT&T denies each and every remaining allegation of paragraph 1 of the Complaint.

2. AT&T admits that AT&T Mobility LLC is a Delaware limited liability company and a wholly-owned subsidiary of AT&T, Inc. and that AT&T Mobility LLC does business under at least the name AT&T Mobility. AT&T denies that AT&T Mobility LLC's principal place of business is at 5565 Glenridge Connector, Atlanta, Georgia 30342. AT&T denies each and every remaining allegation of paragraph 2 of the Complaint.

3. AT&T admits that AT&T Mobility II LLC is a Delaware limited liability company and a wholly-owned subsidiary of AT&T, Inc. and that AT&T Mobility II LLC does business under at least the name AT&T Mobility. AT&T denies that AT&T Mobility II LLC's principal place of business is at 5565 Glenridge Connector, Atlanta, Georgia 30342. AT&T denies each and every remaining allegation of paragraph 3 of the Complaint.

4. AT&T admits that New Cingular Wireless Services, Inc. is a Delaware company and a wholly-owned subsidiary of AT&T, Inc., with its principal place of business at 7277 164th Avenue NE, Redmond, WA 98052-7823. AT&T admits that New Cingular Wireless Services, Inc. does business under at least the name AT&T Mobility. AT&T admits that all three of AT&T Mobility LLC, AT&T Mobility II LLC and New Cingular Wireless Services do business as AT&T Mobility and have overlapping or shared legal departments and/or services and that notice to one company constitutes notice to all AT&T Mobility companies. AT&T denies each and every remaining allegation of paragraph 4 of the Complaint.

**Nature of the Action**

5. AT&T admits that this is a purported civil action purporting to allege infringement of U.S. Patent No. 6,370,153; U.S. Patent No. 5,963,557; U.S. Patent No. 8,310,993; U.S. Patent No. 7,269,127; U.S. Patent No. 7,848,353; U.S. Patent No. 8,396,079; U.S. Patent No. 7,787,431; and U.S. Patent No. 7,385,994 (the "Patents-in-Suit"), purportedly brought under the U.S. Patent Laws, 35 U.S.C. § 1 *et seq.* AT&T denies each and every remaining allegation of paragraph 5 of the Complaint, including any allegations of infringement against AT&T.

**Jurisdiction and Venue**

6. AT&T admits that this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), provided that standing and other requirements are met, because this action purportedly arises under the U.S. patent laws, including 35 U.S.C. § 271 *et seq.* AT&T denies each and every remaining allegation of paragraph 6 of the Complaint.

7. AT&T admits that this Court has personal jurisdiction over AT&T and that AT&T has done business in Delaware. AT&T denies each and every remaining allegation of paragraph 7 of the Complaint.

8. AT&T admits that it maintains places of business within the District from which it makes sales and provides services to its customers. AT&T denies each and every remaining allegation of paragraph 8 of the Complaint.

9. AT&T admits that AT&T is subject to this Court's jurisdiction and that Defendants are incorporated or organized in Delaware. AT&T denies each and every remaining allegation of paragraph 9 of the Complaint.

10. AT&T does not dispute venue in this District for the purposes of this action, pursuant to 28 U.S.C. §§ 1391 and 1400(b), but denies that it is the most convenient forum. AT&T denies each and every remaining allegation of paragraph 10 of the Complaint.

**The Patents-in-Suit**

11. AT&T incorporates by reference its answers to paragraphs 1-10 as if fully set forth herein.

12. AT&T admits that United States Patent No. 6,370,153 ("'153 Patent"), on its face, is entitled "Method and Apparatus for Reserving Resources of One or More Multiple Access Communication Channels," that it states that it issued on April 9, 2002, and that a purported copy of the '153 Patent was attached as Exhibit A to the Complaint. AT&T denies each and every remaining allegation of paragraph 12 of the Complaint.

13. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 of the Complaint and, therefore, denies each and every allegation of paragraph 13 of the Complaint.

14. AT&T admits that United States Patent No. 5,963,557 ("'557 Patent"), on its face, is entitled "High Capacity Reservation Multiple Access Network with Multiple Shared Unidirectional Paths," that it states that it issued on October 5, 1999, and that a purported copy of the '557 Patent was attached as Exhibit B to the Complaint. AT&T denies each and every remaining allegation of paragraph 14 of the Complaint.

15. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15 of the Complaint and, therefore, denies each and every allegation of paragraph 15 of the Complaint.

16. AT&T admits that United States Patent No. 8,310,993 ("'993 Patent"), on its face, is entitled "Acknowledging Communication in a Wireless Network," that it states that it issued on November 13, 2012, and that a purported copy of the '993 Patent was attached as Exhibit C to the Complaint. AT&T denies each and every remaining allegation of paragraph 16 of the Complaint.

17. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17 of the Complaint and, therefore, denies each and every allegation of paragraph 17 of the Complaint.

18. AT&T admits that United States Patent No. 7,269,127 ("'127 Patent"), on its face, is entitled "Preamble Structures for Single-Input, Single-Output (SISO) and Multi-Input, Multi-Output (MIMO) Communication Systems," that it states that it issued on September 11, 2007, and that a purported copy of the '127 Patent was attached as Exhibit D to the Complaint. AT&T denies each and every remaining allegation of paragraph 18 of the Complaint.

19. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 19 of the Complaint and, therefore, denies each and every allegation of paragraph 19 of the Complaint.

20. AT&T admits that United States Patent No. 7,848,353 ("'353 Patent"), on its face, is entitled "Method, Communication System and Communication Unit for Synchronisation for Multi-rate Communication," that it states that it issued on December 7, 2010, and that a purported copy of the '353 Patent was attached as Exhibit E to the Complaint. AT&T denies each and every remaining allegation of paragraph 20 of the Complaint.

21. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21 of the Complaint and, therefore, denies each and every allegation of paragraph 21 of the Complaint.

22. AT&T admits that United States Patent No. 8,396,079 ("'079 Patent"), on its face, is entitled "Communication Units Operating with Various Bandwidths," that it states that it issued on March 12, 2013, and that a purported copy of the '079 Patent was attached as Exhibit F to the Complaint. AT&T denies each and every remaining allegation of paragraph 22 of the Complaint.

23. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 23 of the Complaint and, therefore, denies each and every allegation of paragraph 23 of the Complaint.

24. AT&T admits that United States Patent No. 7,787,431 ("'431 Patent"), on its face, is entitled "Methods and Apparatus for Multi-carrier Communications with Variable Channel Bandwidth," that it states that it issued on August 31, 2010, and that a purported copy of the '431 Patent was attached as Exhibit G to the Complaint. AT&T denies each and every remaining allegation of paragraph 24 of the Complaint.

25. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 25 of the Complaint and, therefore, denies each and every allegation of paragraph 25 of the Complaint.

26. AT&T admits that United States Patent No. 7,385,994 ("'994 Patent"), on its face, is entitled "Packet Data Queuing and Processing," that it states that it issued on June 10, 2008, and that a purported copy of the '994 Patent was attached as Exhibit H to the Complaint. AT&T denies each and every remaining allegation of paragraph 26 of the Complaint.

27. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 27 of the Complaint and, therefore, denies each and every allegation of paragraph 27 of the Complaint.

## Factual Background

### Intellectual Ventures

28. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 28 of the Complaint and, therefore, denies each and every allegation of paragraph 28 of the Complaint.

29. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 29 of the Complaint and, therefore, denies each and every allegation of paragraph 29 of the Complaint.

30. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 30 of the Complaint and, therefore, denies each and every allegation of paragraph 30 of the Complaint.

31. AT&T is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 31 of the Complaint and, therefore, denies each and every allegation of paragraph 31 of the Complaint.

### AT&T's Telecommunications Network

32. AT&T admits that it provides wireless phone services to customers throughout the United States, including in the State of Delaware. AT&T denies each and every remaining allegation of paragraph 32 of the Complaint.

33. AT&T admits that it has been building out its 4G LTE network, that it markets itself as providing the nation's fastest and most reliable 4G LTE network, and that it

expects its 4G LTE network to be substantially complete by the end of 2014. AT&T also admits that it provides 4G LTE service to parts of Delaware. AT&T denies that it uses the "fruits of the inventions" described in the Complaint. AT&T denies each and every remaining allegation of paragraph 33 of the Complaint.

34. AT&T admits that, as of June 30, 2013, AT&T served 107.9 million wireless subscribers. AT&T admits that it promotes its 4G LTE network. AT&T denies that, as of June 30, 2013, 35% of its wireless subscribers have converted to 4G LTE or that over 17 million of its smartphone users have converted to AT&T's 4G LTE service. AT&T denies each and every remaining allegation of paragraph 34 of the Complaint.

35. AT&T's admits that it is facing spectrum and capacity constraints in certain markets. AT&T denies each and every remaining allegation of paragraph 35 of the Complaint.

36. AT&T denies each and every allegation in paragraph 36 of the Complaint.

37. AT&T denies each and every allegation in paragraph 37 of the Complaint.

38. AT&T denies each and every allegation in paragraph 38 of the Complaint.

**Count I**

39. AT&T incorporates by reference its answers to paragraphs 1-38 as if fully set forth herein.

40. AT&T denies each and every allegation in paragraph 40 of the Complaint.

41. AT&T admits that AT&T Corp. is the current assignee of U.S. Patent No. 6,850,981. AT&T denies each and every remaining allegation of paragraph 41 of the Complaint.

42. AT&T denies each and every allegation in paragraph 42 of the Complaint.

**Count II**

43. AT&T incorporates by reference its answers to paragraphs 1-42 as if fully set forth herein.

44. AT&T denies each and every allegation in paragraph 44 of the Complaint.

45. AT&T admits that AT&T Corp. is the current assignee of U.S. Patent No. 6,963,545. AT&T denies each and every remaining allegation of paragraph 45 of the Complaint.

46. AT&T denies each and every allegation in paragraph 46 of the Complaint.

**Count III**

47. AT&T incorporates by reference its answers to paragraphs 1-46 as if fully set forth herein.

48. AT&T denies each and every allegation in paragraph 48 of the Complaint.

49. AT&T denies each and every allegation in paragraph 49 of the Complaint.

**Count IV**

50. AT&T incorporates by reference its answers to paragraphs 1-49 as if fully set forth herein.

51. AT&T denies each and every allegation in paragraph 51 of the Complaint.

52. AT&T denies each and every allegation in paragraph 52 of the Complaint.

**Count V**

53. AT&T incorporates by reference its answers to paragraphs 1-52 as if fully set forth herein.

54. AT&T denies each and every allegation in paragraph 54 of the Complaint.

55. AT&T denies each and every allegation in paragraph 55 of the Complaint.

**Count VI**

56. AT&T incorporates by reference its answers to paragraphs 1-55 as if fully set forth herein.

57. AT&T denies each and every allegation in paragraph 57 of the Complaint.

58. AT&T denies each and every allegation in paragraph 58 of the Complaint.

**Count VII**

59. AT&T incorporates by reference its answers to paragraphs 1-58 as if fully set forth herein.

60. AT&T denies each and every allegation in paragraph 60 of the Complaint.

61. AT&T denies each and every allegation in paragraph 61 of the Complaint.

**Count VIII**

62. AT&T incorporates by reference its answers to paragraphs 1-61 as if fully set forth herein.

63. AT&T denies each and every allegation in paragraph 63 of the Complaint.

64. AT&T denies each and every allegation in paragraph 64 of the Complaint.

**Prayer for Relief**

65. In response to Intellectual Ventures II's Prayer for Relief, AT&T denies that Intellectual Ventures II is entitled to any relief, including the relief sought in paragraphs "a" through "m" of its Prayer for Relief.

**DEFENSES**

66. AT&T asserts the following defenses to Intellectual Ventures II's Complaint. Assertion of a defense is not a concession that AT&T has the burden of proving the matter asserted.

**First Defense**
**(Failure to State a Claim)**

67. Intellectual Ventures II's Complaint, on one or more claims for relief set forth therein, fails to state a claim upon which relief can be granted.

**Second Defense**
**(Non-Infringement)**

68. Defendants have not infringed, and currently do not infringe, any valid claim of the Patents-in-Suit literally or under the doctrine of equivalents, or in any other manner.

**Third Defense**
**(Invalidity)**

69. One or more claims of the Patents-in-Suit are invalid for failure to meet one or more of the conditions of patentability and/or patent eligibility specified in Title 35 of the United States Code, including, without limitation, sections 101, 102, 103, and/or 112.

**Fourth Defense**
**(Prosecution History Estoppel)**

70. The relief sought by Intellectual Ventures II as to the claims of one or more of the Patents-in-Suit is barred under the doctrine of prosecution history estoppel.

**Fifth Defense**
**(Patent Misuse)**

71. Patent misuse renders the asserted claims of the Patents-in-Suit unenforceable. Intellectual Ventures II, individually and in combination with Intellectual Ventures I and affiliates and other entities (collectively, "Intellectual Ventures" or "IV"), has

engaged and is continuing to engage in a scheme to broaden the scope of its patents impermissibly, including the Patents-in-Suit, with anticompetitive effect. *See Intellectual Ventures I LLC et al. v. Symantec Corp.*, C.A. No. 13-440-LPS (D. Del.), D.I. 48 (Symantec Corporation's Answering Brief in Opposition to Plaintiffs' Motion for Leave to File Motion for Summary Judgment on Symantec's Patent Misuse Defense) at 5 ("Publicly available materials, including IV press releases, IV's statements on its website, IV's existing portfolio licenses that IV has described publicly, and statements by IV's founder Nathan Myhrvold, all substantiate that IV's business practice is to aggregate patents reading on existing products, create artificial patent thickets with an exclusionary power exceeding that of the constituent patents and then demand that its victims take licenses to patent portfolios containing many unwanted patents." Symantec's brief goes on to cite public statements by Mr. Myhrvold and statements on Intellectual Ventures' website.). As described below, Intellectual Ventures engages in patent misuse in at least five independent ways.

**A. Impermissible Package Licensing**

72. Intellectual Ventures has compelled and sought to compel licensees and potential licensees to take—and pay for—licenses to irrelevant and unwanted patents ("Tied Patents") as a condition for obtaining licenses to the Patents-in-Suit and related patents reading on cellular and wireless network services ("Tying Patents").

73. Intellectual Ventures' campaign with respect to cellular and wireless network services patents is typical of Intellectual Ventures' prior patent hold-up campaigns, in which it has asserted that various target entities infringe certain patents related to specific technology areas in which the targets practice. Intellectual Ventures then uses the threat of litigation to force those entities to take licenses to other unrelated patents they do not want to

license. On information and belief, entities taking licenses to portfolios containing the Patents-in-Suit do so not because they believe that the patents are valid or infringed, but to buy peace from Intellectual Ventures' unlawful hold-up campaign.

74. Intellectual Ventures asserts that it has monopoly power in the relevant market for a portfolio consisting of patents necessary to employ cellular and wireless network services and potential redesigned alternatives to that technology because no reasonable substitutes exist for a license to that portfolio. For example, Intellectual Ventures alleges that AT&T "refuses to pay royalties for the patent rights necessary to legally employ its 4G LTE technology." Complaint at ¶ 36. For all the Patents-in-Suit, Intellectual Ventures, in its Initial Disclosure of Asserted Patents and Accused Instrumentalities, accuses AT&T of infringement based upon alleged "operat[ing] telecommunication equipment . . . in accordance with certain LTE standards." Taking those accusations as true, Intellectual Ventures claims that a license to its Tying Patent portfolio is essential to entities, such as AT&T, that offer LTE network services. Licensees allegedly thus have no alternatives to turn to, even if Intellectual Ventures raises prices for the Tying Patent portfolio.

75. Previous owners of at least the '353, '079 and '994 Patents-in-Suit also identified those patents as purportedly essential to ETSI standards for cellular and wireless network services. Taking as true the claims of prior owners of those patents, Intellectual Ventures' predecessors-in-interest claim that a license to Intellectual Ventures' Tying Patent portfolio is essential to entities, such as AT&T, that offer LTE network services. Licensees allegedly thus have no alternatives to turn to, even if Intellectual Ventures raises prices for the Tying Patent portfolio.

76. On information and belief, Intellectual Ventures sets the price for any license it offers licensees in a manner that includes value assigned to Tied Patents. Thus, on information and belief, the only licensing package Intellectual Ventures offers putative licensees includes pricing that assigns value to both the Tying and Tied Patents. On information and belief, at least some portion of the portfolio licensing cost for putative Intellectual Ventures licensees is attributable to unwanted patents unrelated to cellular and wireless network services. AT&T is not aware of any impediment preventing Intellectual Ventures from licensing the Tying Patent portfolio in a way that would price the Tying Patent Portfolio on a stand-alone or individual-patent basis without assigning value to the unwanted and irrelevant Tied Patents.

77. Intellectual Ventures prevents putative licensees from evaluating what patents fall within the Tying Patent portfolio license by purposefully obfuscating its patent holdings. Intellectual Ventures creates shell companies to mask its patent holdings and engages in limited and selective disclosures of the content of its patent portfolios in order to prevent a full analysis of what patents Intellectual Ventures may assert as relevant to a putative licensee's products. On information and belief, Intellectual Ventures refuses to identify the specific patents within its portfolio to which it contends putative licensees require a license.

78. Intellectual Ventures thus is leveraging the power of the Tying Patent portfolio, including the Patents-in-Suit, to extract concessions from licensees that are not fairly within the ambit of the patent rights. Intellectual Ventures is seeking to extract supra-competitive royalties for the package license of the Tying and Tied patent portfolios. The extraction of supra-competitive royalties affects a substantial amount of commerce and raises prices to putative licensees and consumers. Additionally, by forcing putative licensees to take a license to thousands of invalid Tied Patents, Intellectual Ventures' licensing conduct has a

negative effect on commercially available technology. Intellectual Ventures reduces the incentives of its coerced licensees to challenge the validity of the Tied Patents, resulting in significant anticompetitive effects in the markets for the Tied Patents and the downstream products implementing those patents. Intellectual Ventures' conduct is directly contrary to the public policy that invalid or non-infringed patents should not repress competition. As demonstrated by Intellectual Ventures' existing portfolio licenses, its conduct of compelling licensees to pay for licenses to irrelevant and unwanted patents is not limited to companies in the cellular and wireless network services space. There are no pro-competitive justifications for Intellectual Ventures' licensing conduct.

79. For these reasons, Intellectual Ventures' misuse of the Tying Patents, including the Patents-in-Suit, directly and significantly contributes to its anticompetitive practices.

**B. Impermissible Collection of Royalties from Invalid and Non-Infringed Patents**

80. By threats and lawsuits, Intellectual Ventures has forced and seeks to force putative licensees to license vast patent portfolios that include thousands of invalid and/or non-infringed patents, including the Patents-in-Suit. Rampant invalidity or inapplicability of the patents in Intellectual Ventures' patent portfolio does not impede Intellectual Ventures' business strategy because, unlike permissible portfolio licensing, Intellectual Ventures' business model is not based on the licensing of valid and valuable patent rights. Instead, Intellectual Ventures uses the threat that it will assert wave after wave of invalid and/or non-infringed patents from a practically inexhaustible portfolio to pummel its targets into submission. The successive lawsuits Intellectual Ventures has filed against AT&T, including the instant suit, are examples of

Intellectual Ventures' hold-up tactics. *See Intellectual Ventures I LLC v. AT&T Mobility LLC et al.*, C.A. No. 12-193-LPS (D. Del.).

81. Intellectual Ventures' conduct has severe anticompetitive effects in a relevant market for a patent portfolio that allegedly includes essential patents necessary for cellular and wireless network services and potential redesigned alternatives to that technology. Intellectual Ventures, as the sole licensor to a patent portfolio for which no adequate substitutes exist, has monopoly power. By forcing putative licensees to accept licenses to thousands of invalid patents, Intellectual Ventures eliminates the economic incentive of its coerced licensees to challenge the validity of those patents. Intellectual Ventures' conduct has significant anticompetitive effects and is directly contrary to the public policy that invalid patents should not repress competition.

**C. Impermissible Collection of Excessive Royalties on Patents Subject to RAND or Royalty-Free Obligations**

82. Intellectual Ventures' patent portfolio contains patents that have been identified by prior patent owners as potentially essential to technology standards created by standard setting organizations ("SSOs"). The prior owners of these purportedly standard-essential patents ("SEPs") identified them pursuant to procedures established by the relevant SSOs, whereby the identifying owner contractually commits to offer a license to its SEPs in a manner consistent with the SSO's licensing policies. Typically, the SSO requires patent owners to agree to license SEPs on fair, reasonable and non-discriminatory ("RAND") or royalty-free terms. These RAND and royalty-free encumbrances are irrevocable and run with the patents. As a successor-in-interest to these agreements, Intellectual Ventures is obligated to honor RAND or royalty-free licensing commitments for SEPs. On information and belief, Intellectual

Ventures is aware that its portfolios contain SEPs subject to RAND and royalty-free licensing obligations.

83. Intellectual Ventures asserts that it has monopoly power in the relevant market for a portfolio that includes essential patents for cellular and wireless network services and potential redesigned alternatives to that technology because no reasonable substitutes exist for a license to that portfolio. For example, Intellectual Ventures alleges that AT&T "refuses to pay royalties for the patent rights necessary to legally employ its 4G LTE technology." Complaint at ¶ 36. For all the Patents-in-Suit, Intellectual Ventures, in its Initial Disclosure of Asserted Patents and Accused Instrumentalities, accuses AT&T of infringement based upon alleged "operat[ing] telecommunication equipment . . . in accordance with certain LTE standards." Previous owners of at least the '353, '079 and '994 Patents-in-Suit also identified those patents as purportedly essential to ETSI standards for cellular and wireless network services. Taking as true the claims of Intellectual Ventures and the Patents-in-Suits' prior owners, licensees have no alternatives to turn to should Intellectual Ventures raise prices for the SEPs related to cellular and wireless network services. Thus, Intellectual Ventures claims that a license to its patent portfolio is essential to entities, such as AT&T, offering cellular and wireless network services.

84. On information and belief, Intellectual Ventures has not offered and does not offer stand-alone licenses to specific purported SEPs, including the Patents-in-Suit, apart from its patent portfolios. Intellectual Ventures has not acknowledged its RAND or royalty-free licensing obligations for purported SEPs. Nor has Intellectual Ventures offered to license purported SEPs—whether individually or collectively—on applicable RAND or royalty-free terms. Intellectual Ventures prevents putative licensees from even evaluating what SEPs may be

included in its portfolio by engaging in purposeful obfuscation and selective disclosures of its patent holdings.

85. Instead of licensing purported SEPs on RAND or royalty-free terms, Intellectual Ventures has conditioned and seeks to condition licenses to purported SEPs on the putative licensee's agreement to pay for licenses to irrelevant and unwanted patents. On information and belief, Intellectual Ventures licenses and seeks to license these portfolios at rates that breach its RAND and royalty-free licensing obligations. On information and belief, Intellectual Ventures offers putative licensees a portfolio license tying purported SEPs to irrelevant and unwanted patents. On information and belief, even when Intellectual Ventures offers stand-alone licenses to SEPs, it is setting the price for those licenses in a manner that assigns value to irrelevant and unwanted patents. By offering only these types of licenses for purported SEPs, Intellectual Ventures extracts a higher royalty for the SEPs than is permissible pursuant to their RAND or royalty-free terms.

86. By these means, Intellectual Ventures uses the SEPs in its portfolios for the anticompetitive purpose of patent hold-ups and thus undermines procompetitive SSO licensing rules. In doing so, Intellectual Ventures leverages the power of the purported SEPs in its portfolio, including the Patents-in-Suit, to extract concessions from licensees that are not fairly within the ambit of the patent rights. Most of the market power of SEPs comes from their inclusion in SSOs' standards, pursuant to certain licensing obligations, and is not inherent in the patents. By extracting royalties above RAND for purported SEPs, Intellectual Ventures obtains a market benefit beyond that to which it is entitled. The extraction of these royalties affects a substantial amount of commerce and raises prices to putative licensees and consumers. As demonstrated by Intellectual Ventures' existing portfolio licenses, its breach of RAND and

royalty-free licensing obligations is not limited to companies in the cellular and wireless network services space.

87. On information and belief, to further its coercive licensing of purported SEPs in violation of its RAND and royalty-free obligations, Intellectual Ventures refuses to enter into licensing negotiations with putative licensees without highly-restrictive non-disclosure agreements. These non-disclosure agreements allow Intellectual Ventures to license or seek to license purported SEPs for rates greater than those dictated by RAND and royalty-free licensing obligations. Pursuant to these agreements, Intellectual Ventures refuses to make public the terms of existing license agreements and commitments implicating purported SEPs. Therefore, Intellectual Ventures' unnecessarily restrictive confidentiality practices make it impossible for putative licensees to determine whether Intellectual Ventures is offering licenses to purported SEPs on nondiscriminatory terms.

**D. Impermissible Collection of Royalties from Exhausted Patents**

88. By threats and lawsuits, Intellectual Ventures forces and seeks to force putative licensees to license vast patent portfolios that include exhausted patents. On information and belief, a substantial number of the patents in Intellectual Ventures' portfolios, including the Patents-in-Suit, are encumbered by licenses that allow the authorized sale of patented products. Pursuant to the longstanding doctrine of patent exhaustion, the initial authorized sale of an item that substantially embodies a patent terminates all patent rights to that item. The doctrine of exhaustion limits the scope of a patent's rights because a patent holder may not seek recovery of multiple royalties by attacking multiple points along the chain of distribution with the same patent.

89. On information and belief, Intellectual Ventures accuses products of patent infringement that putative licensees purchased from entities authorized to sell products substantially embodying patents in Intellectual Ventures' portfolios. For example, AT&T purchases mobile handsets from various suppliers who, on information and belief, have licenses from Intellectual Ventures on undisclosed terms. An unconditional license to those handset makers would exhaust Intellectual Ventures' patent rights as to the use of those suppliers' handsets on AT&T's network as to one or more patents, including (i) at least some of the patents asserted against AT&T in this action and (ii) upon information and belief, patents to which Intellectual Ventures assigns value in licensing offers. Nonetheless, Intellectual Ventures has not disclosed either publicly or to AT&T what the terms of the licenses with the handset makers are and continues to seek a duplicative royalty on those patents through its efforts.

90. Authorized sales to putative licensees have exhausted Intellectual Ventures' rights in the licensed patents, including the Patents-in-Suit. On information and belief, Intellectual Ventures has attacked and seeks to attack multiple points along the chain of distribution for allegedly infringing the same accused patents. By obtaining and seeking royalties for exhausted patents, Intellectual Ventures impermissibly broadens the scope of patent grants with anticompetitive effect.

91. Upon information and belief, Intellectual Ventures furthers its scheme for extracting successive royalties across the distribution chain by refusing to enter into licensing negotiations with putative licensees without highly-restrictive non-disclosure agreements. These non-disclosure agreements allow Intellectual Ventures to threaten entities across the chain of distribution without others in the chain learning of Intellectual Ventures' attempts to obtain multiple royalties. Intellectual Ventures also refuses to make public the terms of existing license

agreements and commitments so that entities in the chain of distribution, such as AT&T, cannot determine whether previous sales were licensed under Intellectual Ventures' patents, thus exhausting Intellectual Ventures' patent rights.

92. Intellectual Ventures' conduct has severe anticompetitive effects in a relevant market for a patent portfolio that, according to Intellectual Ventures, includes essential patents for cellular and wireless network services and potential redesigned alternatives to that technology. Intellectual Ventures, as the sole licensor to that patent portfolio, has monopoly power. By forcing putative licensees to pay royalties on products for which Intellectual Ventures' patent rights are exhausted, Intellectual Ventures restricts output and raise prices in the downstream market for the technology-bearing products, therefore harming consumers. Finally, by raising the costs to companies such as AT&T that compete with Intellectual Ventures' investors, Intellectual Ventures injures competition in the market for cellular and wireless network services, as well as other products and services that it purports to cover with its patent portfolio.

**E. Unlawful Monopolization**

93. Intellectual Ventures has illegally monopolized the market for patent technology rights that it alleges are necessary to employ cellular and wireless network services and potential redesigned alternatives to that technology. Intellectual Ventures has created a monopoly in this market by aggregating and bundling a collection of patents for which, Intellectual Ventures alleges, no substitutes exist. By maintaining exclusive licensing authority over the portfolios and the patents comprising them, Intellectual Ventures purposefully creates, maintains, and exploits bottleneck access to the patents covering these purportedly essential technologies. Intellectual Ventures thus has impermissibly broadened the scope of the Patents-

in-Suit by using them to obtain a market benefit beyond that which inheres in the statutory patent right in a manner that has anticompetitive effects.

94. Intellectual Ventures repeatedly has demonstrated its power to raise prices for its portfolio of patents by successfully charging supra-competitive royalties without suffering loss of demand or sales towards other licensors. Intellectual Ventures extracts payments from licensors that do not reflect the inherent value of the patents in Intellectual Ventures' portfolio, which a putative licensee would pay in a competitive market. Rather, the payments reflect "hold up" value, resulting from Intellectual Ventures' deliberate strategy of mass patent aggregation followed by serial patent assertion.

95. By aggregating patents with the intent of subsequently asserting them in serial litigation—as it has done here to AT&T—Intellectual Ventures makes it prohibitively costly for a target to invest in defending against alleged infringement of Intellectual Ventures' patent portfolio. For even if the target succeeds in defeating Intellectual Ventures' first wave of asserted patents, Intellectual Ventures' strategy is to file subsequent lawsuits until the target submits to accepting a supra-competitive royalty.

96. Consequently, a rational target would pay for limited patent peace, even if Intellectual Ventures does not have a single valid, infringed and non-exhausted patent in its portfolio. Such payments are therefore not compensation for the inventive value of the patents. Rather, they are hold-up payments, entirely attributable to Intellectual Ventures' willful patent aggregation and serial assertion strategy. Deliberately maximizing the cumulative cost of patent litigation in order to extract payments above and beyond the value of the patent in a competitive marketplace extends the patent monopoly to derive benefit not attributable to the use of the patent's teaching and thus constitutes misuse.

97. Intellectual Ventures has acted and continues to act with specific intent to monopolize. It has carefully chosen, aggregated, and asserted patents specifically in order to maximize their cumulative hold-up value.

98. Intellectual Ventures' conduct has harmed the competitive process. For example, Intellectual Ventures forces and seeks to force makers of cellular and wireless network services to pay monopoly overcharges in the markets for cellular and wireless network services and patent portfolios relating to the same, thus raising costs and reducing the incentive to innovate. Operating companies such as AT&T see that if they achieve success by selling a product or service with enough revenue to attract Intellectual Ventures, Intellectual Ventures will seek to "tax" it through supra-competitive royalty demands. These "taxes" are particularly damaging to competition to the extent that they flow to any of Intellectual Ventures' owners that compete against the operating companies. Moreover, Intellectual Ventures' practice of serially asserting waves of invalid, non-infringed, and exhausted patents to intimidate its targets and coerce them into taking portfolio licenses at supra-competitive prices forces its targets to expend significant resources defending against Intellectual Ventures' monopolistic course of conduct. Such supra-competitive royalties also restrict output and raise prices in the downstream market for the technology-bearing products and services, therefore harming consumers. Finally, by raising the costs to companies such as AT&T that compete with Intellectual Ventures' investors, Intellectual Ventures injures competition in the market for cellular and wireless network services, as well as other products and services that it purports to cover with its patent portfolio.

***

99. Through the strategic abuse of its patent portfolio to extract hold-up value, Intellectual Ventures has committed patent misuse rendering the Patents-in-Suit unenforceable

until Intellectual Ventures has fully abandoned its anticompetitive practices and the anticompetitive effects of those practices have been dissipated.

**Sixth Defense**
**(Laches and Estoppel)**

100. Intellectual Ventures II's claims for relief against AT&T are barred in whole or in part by the equitable doctrines of laches and/or estoppel.

101. For example, Intellectual Ventures II is estopped from asserting at least the '353, '079 and '994 Patents-in-Suit against AT&T based on Intellectual Ventures II's failure to license those patents on reasonable and non-discriminatory or fair, reasonable and non-discriminatory (collectively, "RAND") terms, and based on Intellectual Ventures II's delay in bringing this action. For all the Patents-in-Suit, Intellectual Ventures II accuses AT&T of infringement based upon its alleged operation of equipment in compliance with standards for which RAND licensing policies exist.

102. On information and belief, Intellectual Ventures II acquired the '353, '079 and '994 patents from IPWireless, Inc. On information and belief, IPWireless was assigned the '353 patent from 2008 to May 2012, the '079 patent from 2010 to May 2012, and '994 patent from 2003 until May 2012. Intellectual Ventures II acquired the '353, '079 and '994 patents subject to any and all encumbrances placed on those patents by its predecessors-in-interest, including IPWireless.

103. During the period when IPWireless owned the '353, '079 and '994 patents, it was a member of the European Telecommunications Standards Institute ("ETSI"). ETSI is a standards-setting organization that participated in developing the LTE, UMTS Terrestrial Radio Access Interface ("UMTS") and 3rd Generation Partnership Project ("3GPP") standards. ETSI requires its members to make certain declarations regarding their patents to the

extent any of their patents might be essential to compliance with ETSI standards. During its membership in ETSI, IPWireless agreed to abide by the ETSI Intellectual Property Rights Policy.

104. During the period when IPWireless owned the ’353, ’079 and ’994 patents and was a member of ETSI, IPWireless participated in the process of developing the LTE, UMTS and 3GPP standards.

105. Apparently to discharge its obligations under the ETSI Intellectual Property Rights Policy and, on information and belief, other similar obligations, on or about April 24, 2012, IPWireless declared to ETSI that it believed that certain disclosed patents “may be or may become ESSENTIAL in relation to at least the ETSI Work Item(s), STANDARD(S) and/or TECHNICAL SPECIFICATIONS(S) identified” and that it is “prepared to grant irrevocable licenses under this/these IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy.” Clause 6.1 of the ETSI IPR Policy requires the licensing of “ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION” to be licensed on RAND terms.

106. IPWireless’ actions caused ETSI, its members, and the wireless telecommunications industry as a whole to reasonably rely upon the representation by IPWireless that it (like other ETSI participants) would license intellectual property related to the LTE, UMTS and 3GPP standards on RAND terms. To the extent the ’353, ’079 and ’994 patents are interpreted or applied to read upon the LTE, UMTS and/or 3GPP standard, IPWireless’ promise would cover those patents.

107. AT&T reasonably relied on the ETSI Intellectual Property Rights Policy and promises made thereunder, including those by IPWireless and others, as assurances that it

would have the ability to obtain licenses to any standard essential patents on RAND terms. For example, AT&T invested substantial resources in product research, design, manufacturing, sales, marketing, and customer support for products that may practice the LTE, UMTS and/or 3GPP standards in whole or in part.

108. In the present action, Intellectual Ventures II accuses equipment and services that practice the LTE, UMTS and 3GPP standards in whole or in part. Even though it denies that AT&T's alleged practice of the '353, '079 and '994 patents is already licensed, Intellectual Ventures II has not offered to license those patents on a RAND basis to AT&T or, on information and belief, any of AT&T's suppliers. Intellectual Ventures II's failure to offer to license those patents to AT&T on a RAND basis, despite IPWireless' commitments to which Intellectual Ventures II is bound, constitutes materially misleading conduct.

109. To the extent the patents are applied or interpreted to read upon the LTE, UMTS and/or 3GPP standards, AT&T is and has been materially prejudiced by Intellectual Ventures II's allegations of patent infringement and refusal to license on RAND terms.

110. Based on the foregoing allegations, Intellectual Ventures II is barred by the doctrine of equitable estoppel from presently asserting the '353, '079 and '994 patents against AT&T.

111. If Intellectual Ventures II is not entirely estopped from asserting the '353, '079 and '994 patents against AT&T, then, to the extent the '353, '079 and '994 patents are interpreted or applied to read on the LTE, UMTS and/or 3GPP standards, Intellectual Ventures II is barred from seeking any royalty, damages, or enhancement in excess of RAND terms, based on accusations against any part of AT&T's network that is compliant with the LTE, UMTS and/or 3GPP standards.

112. On information and belief, additional Patents-in-Suit may be subject to RAND licensing policies. Specifically, on information and belief, records from the publicly searchable databases of ETSI indicate that the '431 patent may have been subject to a RAND licensing commitment but neither the details of that commitment nor the extent of participation in standard-setting proceedings by the '431 patent inventor(s) and/or assignors are readily available from public sources.

**Seventh Defense**
**(Promissory Estoppel)**

113. AT&T re-alleges and incorporates by reference paragraphs 100-112 as if fully set forth herein.

114. Intellectual Ventures II's claims for relief against AT&T are barred in whole or in part by promissory estoppel, including for any of the Patents-in-Suit burdened by obligations to disclose them to standards setting organizations ("SSOs") and/or to license them under fair, reasonable, and non-discriminatory terms.

115. For example, the ETSI IPR Policy imposed an obligation on holders of patents whose owners were subject to the IPR policy to comply with the IPR policy terms. To comply with that obligation, one or more prior owners of the patents in suit promised to comply with the policy, including promising to license standards essential patents on a RAND basis.

116. One or more prior owners of at least the '353, '079, and '994 patents were subject to ETSI's IPR policies with respect to those patents, as set forth in paragraphs 100-112 above. Furthermore, as set forth in paragraphs 100-112, one or more prior owners made a commitment to license those patents on a RAND basis. This prior obligation and prior commitment was a promise intended to induce reliance by various persons including members of ETSI and/or AT&T. At a minimum, the prior owners intended to induce AT&T and/or others to

practice the LTE, UMTS and/or 3GPP standards that Intellectual Ventures II now asserts infringe the patents, with that reliance being on the basis that any patent necessary to practice the standards would be licensed on a RAND basis.

117. The obligation and/or estoppel arising from this promise extended to future owners of the ‘353, ‘079, and ‘994 patents, including Intellectual Ventures II.

118. AT&T relied on the promises to comply with the ETSI IPR policies with respect to any patents subject to those policies, including but not limited to the ‘353, ‘079, and ‘994 patents, by implementing its cellular and wireless network services in compliance in whole or part with one more or more LTE, UMTS and/or 3GPP standards.

119. AT&T has suffered injury as a result of Intellectual Ventures II’s failure to adhere to those promises.

**Eighth Defense**
**(Legal Estoppel)**

120. AT&T re-alleges and incorporates by reference paragraphs 100-119 as if fully set forth herein.

121. To the extent the ’353, ’079 and ’994 patents are interpreted or applied to read on the LTE, UMTS and/or 3GPP standards, Intellectual Ventures II is barred by the doctrine of legal estoppel from seeking any royalty, damages or enhancements in excess of RAND terms, based on accusations against any part of AT&T’s network that is compliant with the LTE, UMTS and/or 3GPP standards. On information and belief, additional Patents-in-Suit may be subject to RAND licensing policies, as set forth in paragraph 112, supra.

122. For all the Patents-in-Suit, Intellectual Ventures II accuses AT&T of infringement based upon its alleged operation of equipment in compliance with standards for which RAND licensing policies exist.

**Ninth Defense**
**(Breach of Contract)**

123. AT&T re-alleges and incorporates by reference paragraphs 100-122 as if fully set forth herein.

124. Intellectual Ventures II's claims for relief against AT&T are barred in whole or in part by the defense of breach of contract at least because it or prior assignees of the Patents-in-Suit breached their contractual obligations to disclose the Patents-in-Suit to SSOs and/or to license them under fair, reasonable and non-discriminatory terms.

125. For example, the ETSI IPR Policy imposed a contractual obligation on holders of patents whose owners were subject to the IPR policy to comply with the IPR policy terms. This obligation extends not only to the participant in the SSO proceedings but also to any subsequent patent owners. Thus, Intellectual Ventures II was subject to a contractual obligation to comply with ETSI's IPR policies to the extent any prior owners of the Patents-in-Suit were subject to ETSI's IPR policies with respect to those patents.

126. One or more prior owners of at least the '353, '079, and '994 patents were subject to ETSI's IPR policies with the respect to those patents, as set forth in paragraphs 100-112 above. Furthermore, as set forth in paragraphs 100-112, one or more prior owners made a commitment to license those patents on a RAND basis. These prior obligations and commitments each imposed a contractual duty on future owners of the '353, '079, and '994 patents to comply with ETSI's IPR policies, including the obligation to offer a license to any standard-essential patent on a RAND basis. As the alleged assignee of the '353, '079, and '994 patents, Intellectual Ventures II is contractually bound to offer AT&T a license to those patents on a RAND basis in conjunction with the practice of the LTE, UMTS and/or 3GPP standards.

127. As industry participants that would potentially implement the standards established by ETSI, AT&T and their vendors are intended third-party beneficiaries of the contractual commitments to ETSI.

128. Intellectual Ventures II has breached that contractual obligation by not offering AT&T a license to any of the '353, '079, and '994 patents. On information and belief, as set forth in paragraph 112, supra, additional Patents-in-Suit may be subject to RAND licensing obligations. To the extent there is a RAND licensing obligation for any additional patent, Intellectual Ventures II's breach of contract would extend to the failure to offer a license to that patent on RAND terms, too.

129. AT&T has suffered injury as a result of Intellectual Ventures II's breach of its contractual obligation and continues to suffer such injury.

**Tenth Defense**
**(License and Exhaustion)**

130. AT&T re-alleges and incorporates by reference paragraphs 100-129 as if fully set forth herein.

131. Intellectual Ventures II's claims for relief against AT&T are barred in whole or in part by license or exhaustion, express or implied, and/or restrictions on double recovery.

132. Upon information and belief, the relief sought by Intellectual Ventures II is barred by license and/or under the doctrine of patent exhaustion, to the extent the alleged infringement of Intellectual Ventures II's asserted patents is based in whole or in part on the actions of any party licensed and/or otherwise authorized to practice claims in Intellectual Ventures II's asserted patents.

133. Additionally, AT&T is a beneficiary of IPWireless' agreements with ETSI to license intellectual property relating to the LTE, UMTS and 3GPP standards on RAND terms.

134. To the extent the '353, '079 and '994 patents are interpreted or applied to read on the UMTS and/or 3GPP standards, Intellectual Ventures II is also barred by AT&T's implied license from seeking any royalty, damages, or enhancements in excess of RAND terms, based on accusations against any part of AT&T's network that is compliant with the LTE, UMTS and/or 3GPP standards.

135. On information and belief, additional Patents-in-Suit may be subject to RAND licensing policies, as set forth in paragraph 112, supra.

136. For all the Patents-in-Suit, Intellectual Ventures II accuses AT&T of infringement based upon its alleged operation of equipment in compliance with standards for which RAND licensing policies exist.

**Eleventh Defense**
**(Unclean Hands)**

137. AT&T re-alleges and incorporates by reference paragraphs 100-136 as if fully set forth herein.

138. Intellectual Ventures II is not entitled to any relief or recovery by reason of its coming into this Court with unclean hands, including for the reasons set forth above regarding patent misuse.

139. Based on the foregoing, Intellectual Ventures II's infringement claims are barred by the doctrine of unclean hands. In the alternative, to the extent the '353, '079 and '994 patents are interpreted or applied to read on the LTE, UMTS and/or 3GPP standards, Intellectual Ventures II is barred by the doctrine of unclean hands from seeking any royalty, damages or

enhancement in excess of RAND terms, based on accusations against any part of AT&T's network that is compliant with the LTE, UMTS and/or 3GPP standards.

140. On information and belief, additional Patents-in-Suit may be subject to RAND licensing policies, as set forth in paragraph 112, supra.

141. For all the Patents-in-Suit, Intellectual Ventures II accuses AT&T of infringement based upon its alleged operation of equipment in compliance with standards for which RAND licensing policies exist.

**Twelfth Defense**
**(Waiver)**

142. AT&T re-alleges and incorporates by reference paragraphs 100-141 as if fully set forth herein.

143. IPWireless' commitment to ETSI constitutes a waiver of any right to enforce the '353, '079 and '994 patents against any qualified practice of the LTE, UMTS and/or 3GPP standards on non-RAND terms.

144. Accordingly, to the extent the '353, '079 and '994 patents are interpreted or applied to read on the LTE, UMTS and/or 3GPP standards, Intellectual Ventures II is barred by the doctrine of waiver from seeking any royalty, damages, or enhancement in excess of RAND terms, based on accusations against any part of AT&T's network that is compliant with the LTE, UMTS and/or 3GPP standards.

145. On information and belief, additional Patents-in-Suit may be subject to RAND licensing policies, as set forth in paragraph 112, supra.

146. For all the Patents-in-Suit, Intellectual Ventures II accuses AT&T of infringement based upon its alleged operation of equipment in compliance with standards for which RAND licensing policies exist.

**Thirteenth Defense**
**(Limitations on Damages)**

147. AT&T re-alleges and incorporates by reference paragraphs 100-146 as if fully set forth herein.

148. In the event that AT&T is found to infringe valid and enforceable claims of the Patents-in-Suit, damages for any of the Patents-in-Suit burdened by disclosure obligations to SSOs and/or obligations to be licensed under fair, reasonable, and non-discriminatory terms are at least limited to fair, reasonable, and non-discriminatory terms, or, in the event prior assignees of the Patents-in-Suit committed to license the Patents-in-Suit royalty-free, Intellectual Ventures II may not recover any damages.

**Fourteenth Defense**
**(No Exceptional Case)**

149. Intellectual Ventures II cannot prove that this is an exceptional case justifying an award of attorney fees against AT&T, under 35 U.S.C. §§ 284 and 285.

**Fifteenth Defense**
**(Failure to Mark)**

150. Intellectual Ventures II's claim for damages is limited by, without limitation, 35 U.S.C. §§ 286 and 287.

**Sixteenth Defense**
**(No Recovery of Costs)**

151. Intellectual Ventures II's recovery of costs is limited under 35 U.S.C. § 288.

**Seventeenth Defense**
**(No Injunctive Relief)**

152. Intellectual Ventures II is not entitled to injunctive relief.

**Eighteenth Defense**
**(Reservation of Affirmative Defenses)**

153. AT&T reserves all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses at law or in equity that may exist now or that may be available in the future based on discovery and further factual investigation in this action.

**PRAYER FOR RELIEF**

WHEREFORE, AT&T prays as follows:

A. That the Complaint against AT&T be dismissed in its entirety with prejudice and that a judgment be entered for AT&T;

B. That Intellectual Ventures II take nothing by reason of its Complaint;

C. For an order denying any and all of Intellectual Ventures II's requests for injunctive relief against AT&T;

D. That AT&T be awarded under 35 U.S.C. § 285 its reasonable attorneys' fees and costs of suit incurred in this litigation, as Intellectual Ventures II's conduct as set forth above renders this an exceptional case; and

E. For such other relief as the Court deems proper.

**DEMAND FOR A JURY TRIAL**

AT&T demands a jury trial, pursuant to Fed. R. Civ. P. 38(b), as to all issues that may be tried by a jury.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs*

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
kjacobs@mnat.com
jying@mnat.com

*Attorneys for AT&T Mobility LLC, AT&T Mobility II LLC and New Cingular Wireless Services, Inc.*

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Josh Krevitt
Benjamin Hershkowitz
200 Park Avenue
New York, NY 10166
Tel: (212) 351-4000
jkrevitt@gibsondunn.com
bhershkowitz@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Frederick S. Chung
1881 Page Mill Road
Palo Alto, CA 94304
Tel: (650) 849-5300
fchung@gibsondunn.com

October 27, 2014

8624130.2